**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:      1:21-cv-03282-SKC

EGOSCUE, INC., a California corporation,

      Plaintiff,

v.

PAIN FREE POSTURE THERAPY, LLC, a Colorado limited liability company, ANU
LAWRENCE, an individual, and JOHN DOES.

      Defendants.

---

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

---

Defendants Pain Free Posture Therapy, LLC and Anu Lawrence (collectively, "Defendants") oppose Plaintiff Egoscue, Inc.'s ("Plaintiff" or "Egoscue") Motion for Preliminary Injunction ("Motion") as follows.

## INTRODUCTION

Plaintiff's Motion should be denied due to the mandatory arbitration provision in the Franchise Agreement. The parties have been arbitrating this dispute for months in an ongoing AAA proceeding. There was no basis to initiate this parallel proceeding other than to increase attorney fees and costs to Defendants. A motion to stay pending completion of that arbitration is filed contemporaneously herewith.

If allowed to proceed, Plaintiff's Motion should be denied on the merits. Plaintiff seeks an injunction preventing "imminent harm" from an incident that occurred *five months* ago. Mr. Lawrence sent an email to his clients that he was ending his relationship with Plaintiff. Plaintiff claims this email bore its logo and thus, Mr. Lawrence allegedly infringed on Plaintiff's trademark.

Plaintiff terminated Mr. Lawrence's franchise and threatened an emergency injunction. But there was no emergency. Plaintiff sat by for nearly five months seeking no injunction despite its claim of immediate and irreparable harm.

Plaintiff's trademark claims fail as there was no "trademark use" and no consumer confusion. While Plaintiff's logo was on the email, the email made it clear that Mr. Lawrence was "ceasing" his relationship with Plaintiff, starting a "new chapter" and "operating independently."

Plaintiff's misappropriation claims fail because the client list belongs to Mr. Lawrence. Mr. Lawrence created the list and the Franchise Agreement corroborates that it belongs to him. Plaintiff argues that a "MindBody Agreement" and a "Confidentiality Agreement" support its misappropriation claim. However, the agreements are blank. They are mere templates. The Parties never signed, dated or entered into those agreements. Their terms are thus irrelevant.

## BACKGROUND

Plaintiff's lawsuit is motivated by Mr. Lawrence's decision to end his Egoscue franchises. Mr. Lawrence operated two franchises with Plaintiff, one in Boulder beginning on July 1, 2011 and another in Denver beginning on April 6, 2016. *See* Declaration of Anu Lawrence ("Lawrence Decl."), attached as Exhibit A, ¶2. Mr. Lawrence could terminate each agreement on 30 days' notice. Denver Franchise Agreement ("FA"), Plaintiff's Exhibit B, §14.1.[1]

In July 2021, Mr. Lawrence terminated his Boulder franchise. Lawrence Decl., ¶2. Mr. Lawrence retained his clients and his client list. *Id.* In fact, Plaintiff told Mr. Lawrence that he had to service and honor the clients' prepaid packages. *Id.*

In September 2021, Mr. Lawrence terminated his Denver franchise effective in 30 days. *See* Plaintiff's Exhibit C. He emailed his clients that he was ceasing his relationship with Egoscue.

---

[1] For any exhibits used by both parties, Defendants will cite to Plaintiff's exhibits to avoid duplication.

*See* Plaintiff's <u>Exhibit D</u>. He stated he will operate independently from Egoscue as Pain Free Posture Therapy.[2] *Id.* The email also stated that Mr. Lawrence would honor the pre-paid packages, as contemplated in the Franchise Agreement and mandated by Plaintiff. *Id.* The email was sent through a third-party platform called Constant Contact. Constant Contact auto-filled Egoscue's logo onto the email. Lawrence Decl., ¶5. Nonetheless, the email made it clear that Mr. Lawrence would have no affiliation with Egoscue.

As soon as Mr. Lawrence notified Plaintiff of his intent to terminate, Plaintiff terminated the franchise agreement. *See* Plaintiff's <u>Exhibit E</u>. Plaintiff premised the termination on the email stating it somehow infringed on Plaintiff's trademark and confused consumers. *Id.* It claimed harm was imminent and an injunction was forthcoming. *Id.*

On November 8, 2021, Plaintiff initiated arbitration against Defendants with the American Arbitration Association ("AAA") styled *Egoscue, Inc. v. Anu Lawrence and Pain Free Posture Therapy, LLC*, Case No. 01-21-0017-2374. Lawrence Decl. ¶7. Plaintiff sought neither emergency relief in the arbitration nor a preliminary injunction in court. *Id.,* and AAA Commercial Arbitration Rule 38. Instead, the parties selected an arbitrator, participated in scheduling hearings, and propounded discovery. *Id.* Now, nearly five months after the email occurred and only four months before the final arbitration hearing, Plaintiff files its Motion seeking "emergency" relief.

## **ARGUMENT**

### I.     **Plaintiff has failed to comply with the Franchise Agreement's mandatory arbitration provision.**

The parties have been arbitrating this dispute for five months with the AAA in *Egoscue, Inc. v. Anu Lawrence and Pain Free Posture Therapy, LLC*, Case No. 01-21-0017-2374. The final

---

[2] There was no non-compete or non-solicitation provision in the franchise agreements.

arbitration hearing is approximately four months away in July 2022. Consistent with Defendants'

contemporaneous Motion to Compel Arbitration, Plaintiff must return to the pending arbitration.

The Franchise Agreement requires every claim to be submitted to arbitration:

> Arbitration of Disputes. Except for disputes arising under Paragraph 14.3, **any dispute, controversy or claim arising out of or related to this Agreement, or breach thereof, shall be settled by binding arbitration** administered by the American Arbitration Association under its Commercial Arbitration Rules, at San Diego, California, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

FA, § 16.14 (emphasis added).

The arbitration provision carves out "disputes arising under Paragraph 14.3," however,

paragraph 14.3 also requires arbitration:

> 14.3.   In the event that Egoscue gives to Licensee any notice of default and/or notice of termination pursuant to Section 14.2, and Licensee disputes the right of Egoscue to terminate this Agreement pursuant to said notice or notices, then upon written demand made by Licensee upon Egoscue at any time prior to or within ten (10) days after notice of termination, **such dispute shall be submitted to arbitration in accordance with Expedited Procedures Rules for commercial arbitration of the American Arbitration Association in San Diego, California**, and the prevailing party, as determined by the arbitrator(s) shall be entitled to its reasonable attorney fees and costs.

*Id.*, § 14.3 (emphasis added).

When an arbitration clause covers "any dispute" arising from, related to or with respect to

an agreement, as here, such an arbitration clause is considered broad and entitled to the

presumption in favor of arbitrability. *See, e.g. Wolford v. Flint Trading, Inc*., 2014 WL 3747177

at *2 (D. Colo. July 30, 2014) (Judge Daniel). Under that presumption, any disputes that "touch"

the underlying contract should be arbitrated. *Id*. at *5.

There was no reason for Plaintiff to initiate this parallel proceeding. This dispute arises

from the Franchise Agreement. All of Plaintiff's claims are premised on rights granted under the

Franchise Agreement. This entire case should be dismissed and proceed in arbitration. Should

Plaintiff need preliminary injunctive relief, it must file a motion under Rule 37 and 38 of the Commercial Arbitration Rules. *See* AAA R-37(a) (empowering the arbitrator to "take whatever interim measures he or she deems necessary, including injunctive relief."); *see also* AAA R-38(e) (allowing for emergency relief upon a showing of potential "immediate and irreparable loss or damage[.]").

## II.   Plaintiff is not entitled to an injunction.

Plaintiff recites the elements necessary to obtain an injunction but fails to analyze them. To obtain injunctive relief in federal court, Plaintiff must establish (1) a likelihood of success on the merits; (2) likelihood of irreparable harm; (3) that the balance of the equities weighs in favor of granting the injunction; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

### A.   Plaintiff is not likely to succeed on the merits.

#### i.   Infringement Claims.

##### a.   Mr. Lawrence's "non trademark" use cannot infringe.

The incident Plaintiff complains about is not actionable under the Lanham Act. "[T]he likelihood of confusion analysis also involves a preliminary question: whether the defendants are using the challenged mark in a way that identifies the source of their goods. If they are not then the mark is being used in a 'non-trademark way' and trademark infringement laws . . . do not even apply." *See, e.g., Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009) (emphasis added). Indeed, mere publication of the Plaintiff's name is not sufficient to support a claim; instead the alleged use must result in a likelihood of confusion. *See Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1001 (10th Cir. 2014); *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013).

The email Mr. Lawrence sent on Egoscue's letterhead makes no trademark use and specifies that he will have no affiliation with Plaintiff:

> Dear friends of Egoscue Boulder and Denver,
>
> We are extremely grateful and proud to have served our clients for over a decade in leading ideal, pain-free lives, without the limitations of chronic pain and stress as Egoscue franchises. Our clients are like family to us and your best interests are what guide us.
>
> **We have made the decision to <u>cease</u> our relationship with Egoscue, Inc.**, effective in a month's time.
>
> We will honor all existing client packages, of course. Many will ask why the change. Simply, **we know that we can better serve our clients <u>operating independently</u> as a Pain Free Posture Therapy and we are excited to announce this new chapter. While we will not be using Egosuce branding going forward**, we will offer the same great service and excellent posture therapy you have come to expect from us.
>
> We look forward to continuing to serve you and your loved ones for many years to come. We can't wait to welcome you to our new central location in Westminster (or on Zoom) and appreciate your continued support and understanding.
>
> Questions can be directed to info!painfreeposture.net or 720-454-8396 (Anu cell).
>
> More info on our new clinic space and contact info to come in future emails.
>
> Sincerely,
> Anu, Kayla, and Emily
> The Pain Free Posture Therapy Team.

*See* Plaintiff's <u>Exhibit D</u>, (Emphasis added).

Mr. Lawrence did not make trademark use of the term "Egoscue." Egoscue's logo was auto filled onto the email by a third-party platform - Constant Contact. Lawrence Decl., ¶5. Mr. Lawrence did not confuse customers, he specified that he decided to "cease [his] relationship with Egoscue, Inc.", that he is beginning a "new chapter" in a "new clinic space" and "operating independently as Pain Free Posture Therapy[.]" Plaintiff's <u>Exhibit D.</u>

Accordingly, Plaintiff cannot prove that there is a likelihood of confusion as the source of services. Plaintiff submits not one piece of documentary evidence showing confusion. It submits no affidavit from any consumer. Instead, it submits an affidavit from its owner alleging that unspecified customers were confused. FA, ¶15, 17, and FRE 802 (hearsay is not admissible). Mr. Haley does not identify these customers by name; he does not identify the number of customers; and he does not state when they were confused or in what regard they were confused. Plaintiff's conclusory and generalized allegation is insufficient to show a likelihood of confusion.

### ii.    Misappropriation claims.

#### a.    The Client List is not a Trade Secret.

Plaintiff relies heavily on Colorado law arguing Defendants misappropriated a client list. However, the parties agreed that California law governs their relationship pursuant to the choice of law provision in the Franchise Agreement. (FA, §16.10) ("Governing Law. This Agreement has been executed in and shall be governed by the laws of the State of California.").

Common law and California's Uniform Trade Secrets Act agree the client list is not Plaintiff's trade secret. This issue was presented in *Scott v. Snelling & Snelling, Inc*., where the former franchisee argued that the client list was not the franchisor's trade secrets. 732 F. Supp. 1034 (N.D. Cal. 1990).

Under California legal principles, the *Scott* court was required to "determine for itself whether the information allegedly used constitute[d] a trade secret subject to judicial protection at all." *Id.,* at 1043. Like Colorado, California adopted the UTSA and the court relied upon the UTSA to analyze whether customer lists are trade secrets. *Id.* The court opined that the customer lists were generated from generally available public information, such that they did not meet the requirement under the UTSA that the value derives from not being generally known to the public.

*Id.* The clients were businesses, and their names were "easily discoverable through public sources." *Id.* at 1044. The Court further observed that, when the restrained party has developed a customer list through its own efforts, courts have repeatedly held that a customer list does not constitute a trade secret "because equity has no power to compel a man who changes employers to wipe clean the slate of his memory." *Id.* (internal quotation marks and citations omitted).

As in *Scott,* Mr. Lawrence's client list was cultivated by his own time, expenditures, networking, and marketing. Lawrence Decl., ¶3. The client list grew due to Mr. Lawrence's sweat equity. *Id.* Moreover, the information within the client list is not confidential; the names and phone numbers are publicly available in any phone book. *Id.*

Plaintiff has previously agreed that the clients belong to Mr. Lawrence. Mr. Lawrence operated two Egoscue franchises, one in Boulder and one in Denver. When Mr. Lawrence ended his Boulder franchise in July 2021, the clients stayed with Mr. Lawrence. Plaintiff even insisted that Mr. Lawrence honor and service the pre-paid packages. Lawrence Decl., ¶4.

Plaintiff's repeated citation to Section 6.1 is unavailing. Plaintiff argues that 6.1 prevents Mr. Lawrence from using Plaintiff's purported trade secrets. Simply because section 6.1 states Plaintiff owns trade secrets does not mean that the client list is a trade secret. Nor does it mean the client list belongs to Plaintiff. In fact, the actual terms of §6.1 provide that

> [Egoscue's] trade secrets include, but are not limited to processes, essential equipment and accessories, systems, product catalogues, price lists, training manuals, exercises, operating manuals, policy manuals, sale promotion aids, business forms, accounting procedures, marketing reports, informational bulletins, and inventory systems, including without limitation The Egoscue Licensed Clinic Manual as such may be modified from time to time ("Manual"), attached hereto as Exhibit I, (collectively referred to herein as "Proprietary Information")…

(FA, at §6.1)

Notably, Plaintiff cited §6.1 seven times but omitted §6.1's definition of Trade Secrets from its Motion. Nowhere in §6.1's definition of Trade Secrets does it identify client lists. Rather, the Franchise Agreement states the clients belong to Mr. Lawrence. Section 2.7 grants Mr. Lawrence the right to "[u]se the Egoscue URL address www.egosuce.com ("Web Site") for the benefit of **Licensee's clients**." (FA, §2.7 (emphasis added); and introductory paragraph defining Mr. Lawrence as "Licensee"). Likewise, paragraph 4 in Exhibit G to the FA states "**Licensee** will only utilize products on the Approved Equipment List for use with **its clients**." *See* FA, Exhibit G, ¶4) (emphasis added).

The client list is not a trade secret under California law, Colorado law or the Franchise Agreement. The client list belongs to Mr. Lawrence. It was created by him for his use.

### iii.  Plaintiff's MindBody Agreement and Confidentiality Agreement Are Unsigned and Undated.

Plaintiff cites a "MindBody Agreement" and a "Confidentiality Agreement" to impose restrictions on Mr. Lawrence to obtain a preliminary injunction. Plaintiff attaches these agreements as <u>Exhibits F</u> and <u>G</u> to the Declaration of Meta Haley. The agreements are blank. They are mere templates. They are not signed or dated.

Despite knowing Mr. Lawrence did not sign the agreements, Plaintiff attempts to intimidate Mr. Lawrence from engaging in a lawful occupation. In essence, Plaintiff is preventing Mr. Lawrence from competing. This conduct is expressly prohibited by C.R.S. § 8-2-113(1) and is criminal. Colorado recently became the first state to criminalize the use of void non-compete agreements. The law makes it a class 2 misdemeanor for employers to implement void restrictive covenants.

The only signed agreement proffered by Plaintiff is the Franchise Agreement and nothing in the Franchise Agreement prohibits Mr. Lawrence from competing with Plaintiff or continuing to service his own clients.

**B. There is no irreparable harm.**

"There is, of course, no irreparable harm cognizable by law if there has been no infringement." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235, 1257 (D. Colo. 2009). Even if harm was presumed here, it would be weak. *Vornado Air Circulation Sys. v. Duracraft Corp.*, 58 F.3d 1498, 1509 (10th Cir.1995) ("The degree to which a producer's goodwill will be harmed by the copying of product configurations correlates with the degree of customer confusion as to source or sponsorship that is likely to result from the copying."); *see also General Motors Corp. v. Urban Gorilla, LLC,* 500 F.3d 1222, 1227 (10th Cir.2007) ("GM made an insufficient showing with respect to infringement. Thus the district court was not obligated to find irreparable injury to GM and could conclude that monetary compensation may well be ample and sufficient in the event that GM ultimately prevails."). (Internal quotations omitted).

      **i. An injunction should not issue because Egoscue sat on its rights and waited for five months to seek injunctive relief.**

Plaintiff terminated Mr. Lawrence's franchise on October 5, 2021 following Mr. Lawrence's email on Egoscue letterhead to his clients that he is ending his relationship with Egoscue. In the termination letter, Plaintiff claimed the email had the immediate "potential to create irreparable harm." Plaintiff said they would seek an injunction and bullied Mr. Lawrence saying he must "**govern [himself] accordingly**" (bold in original). But Plaintiff's feigned peril resulted in no attempt to obtain an injunction from the arbitrator or a court. In fact, Plaintiff sat by for nearly *five months* seeking no injunction despite its claim of immediate and irreparable harm. The law does not look favorably on such delay. "Unexplained delay in seeking 'emergency'

injunctive relief undercuts a claim that an injunction is necessary to prevent immediate and irreparable injury." *Dahl v. Swith Distrib., Inc.*, 2010 WL 1458957, at *3 (C.D. Cal. April 1, 2010). "Equity aids only the vigilant, and injunctive relief will be denied to those who slumber upon their rights." *Int'l Union v. Local Union No. 589*, 693 F.2d 666, 674 (7th Cir.1982).

Waiting even two months has been deemed an unconscionable delay that undercuts the legitimacy of the "emergency" relief sought. In *Occupy Sacramento v. City of Sacramento*, the trial court denied a temporary restraining order relating to a First Amendment issue because the plaintiffs waited twenty-five days from the date of a relevant court order to seek a temporary restraining order. No. 2:11-CV-02873-MCE, 2011 WL 5374748, at *4 (E.D. Cal. Nov. 4, 2011).

In *AK Metals, LLC v. Norman Indus. Materials, Inc.*, the plaintiff filed suit and then waited two months to move for emergency relief. The court denied the motion, observing that plaintiff's delay "implies a lack of urgency and of irreparable harm." No. 12CV2595-IEG (WVG), 2012 WL 12884574, at *2 (S.D. Cal. Dec. 21, 2012); *see also Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060–62 (7th Cir. 2016) (upholding trial court's denial of a temporary restraining order/preliminary injunction because plaintiffs waited more than two months to file suit); *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983) (preliminary injunction denied where plaintiff waited two months to file suit); *GTE Corp. v. Williams*, 731 F.2d 676, 678–79 (10th Cir. 1984) (observing that delay in seeking an injunctive relief is a factor to be considered in assessing irreparable injury) (citations omitted).

**C.  The Balance of Equities and Public Interest Do Not Support an Injunction.**

The public interest cautions against issuing a preliminary injunction on the present record. *Winter*, supra, 129 S. Ct. 365, 376-377 (2008) ("'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the

extraordinary remedy of injunction.'") (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)).

Mr. Lawrence spent a decade building his client base through his own time, money and energy. Plaintiff has repeatedly taken the position that the clients belong to Mr. Lawrence and the Franchise Agreement corroborates that. It would be inequitable for Plaintiff to reap the fruits of Mr. Lawrence's labor. Enjoining Mr. Lawrence from his own revenue source would deprive his ability to earn a living. Indeed, he would have to close his business and lay off his employees. Lawrence Decl., ¶8.

An injunction would also require the Court to disregard the mandatory arbitration provision within the Franchise Agreement.  *See* FA, § 16.14. This would erode the public's interest in freedom of contract. The parties contracted for an arbitrator to decide the dispute between them and courts "hold no authority to rewrite contracts and must enforce unambiguous documents in accordance with their terms." *McShane  v. Stirling Ranch Property Owners Association, Inc*., 393 P.3d 978, 982 (Colo. 2017). It would also defy the "federal policy favoring arbitration agreements" recognized by the 10th Circuit and the United States Supreme Court.  *National American Ins. Co. v. SCOR Reinsurance Co*., 362 F.3d 1288, 1290 (10th Cir. 2004) *quoting Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002). Under this policy, the "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Spahr v. Secco,* 330 F.3d 1266, 1269 (10th Cir. 2003).

### III.    Plaintiff Must Post a Substantial Security Bond to Receive an Injunction.

Courts may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c) (emphasis added). If it enters a preliminary

injunction, this Court should condition the injunction upon Plaintiff posting a $300,000 security bond which is approximately one year's worth of revenue for Mr. Lawrence's business. Lawrence Decl., ¶8. Only the posting of such a bond can adequately protect Defendants from the damages they will incur from an improvidently granted preliminary injunction.

"When setting the amount of security, district courts should err on the high side." *Mead Johnson v. Abbot Labs*., 201 F.3d 883, 888 (7th Cir. 2000). "An error in setting the bond too high [] is not serious." *Id*. "Unfortunately, an error in the other direction produces irreparable injury." *Id*. Here, $300,000 is necessary and appropriate to protect Defendants.

If successful here, Plaintiff's injunction would end Defendant's operation for years while this matter proceeds through discovery, motions practice, dispositive motions, continuances, and trial. When Defendants succeed on the merits, they will not only have lost the gross revenue generated by the clients, but they will have had to pay operating expenses for the business out-of-pocket, and the business will have suffered irreparable damage in terms of customer loyalty and market share due to its substantial time out-of-business. $300,000 is more than reasonable, and possibly too low, to cover Defendants' likely damages suffered from an improvidently granted injunction.

Relieving Plaintiff from posting a bond precludes Defendants from any remedy when they demonstrate the injunction was improvidently granted because Defendants' damages are limited to the bond amount. *See Adolph Coors Co. v. A & S Wholesalers*, 561 F.2d 807, 813 (10th Cir. 1977).

## <u>CONCLUSION</u>

Defendants request the Court deny Plaintiff's Motion for Preliminary Injunction, award Defendants their attorney fees and costs pursuant to applicable rule, statute, or contractual

provision, and for any further relief this Court deems necessary.

DATED this 4th day of March, 2022.

**ROBINSON WATERS & O'DORISIO, P.C.**

By:  _/s/Nicholas F. Labor_____
Harold R. Bruno III
Nicholas F. Labor
*Counsel for Defendants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 4th day of March, 2022, a true and correct copy of the foregoing **RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** was electronically filed with the Clerk of the Court and electronically served on all parties via PACER, and correctly addressed as indicated below:

R. Keith McKellogg,
7979 Ivanhoe Ave., Ste. 200
La Jolla, CA 82037
(858) 459-0583
kmckellogg@cmkr.com
Counsel for Plaintiff

By:  _/s/ James Andersen_____
James Andersen
*(Original Signature on file in Counsel's Office)*